

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: January 12, 2021.**

_____
**CRAIG A. GARGOTTA**
**UNITED STATES BANKRUPTCY JUDGE**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 20-50612-CAG |
| | § | |
| RICKEY CONRADT, INC., | § | |
| | § | CHAPTER 11 |
| Debtor. | § | |

### MEMORANDUM OPINION AND ORDER GRANTING IN PART, DENYING IN PART DEBTOR'S AMENDED OBJECTION TO CLAIM OF THE ESTIMATING GROUP LLC, POC NO. 5-1 (ECF NO. 93)

Came on to be considered the above-numbered bankruptcy case, and, in particular, Debtor's Amended Objection to Claim of The Estimating Group LLC, POC No. 5-1 (ECF No. 93) ("Debtor's Amended Objection to Claim"), and The Estimating Group's ("Estimating Group" or "EG") Response thereto (ECF. No. 75).[1]  The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. Venue is proper under 28 U.S.C. § 1408(1).  This matter is a core proceeding under 11 U.S.C. §§ 157(b)(2)(A) (matters affecting the administration of the estate) and (B) (allowance and disallowance of claims) in which the Court may enter a final order.  This

---

[1] "ECF" refers to the electronic court filing number on the case docket. The Estimating Group's Response was to the Debtor's Objection to Claim. (ECF No. 71). The Estimating Group did not file a response to the Amended Objection to Proof of Claim.

matter is referred to this Court under the District Court's Standing Order of Reference. This is a contested matter as defined under Fed. R. Bankr. P. 9013. As such, the Court makes its findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 9014. The Court has the requisite authority to issue a final order. *See Stern v. Marshall*, 564 U.S. 462 (2011) (finding that a bankruptcy court may issue final orders in claim objections). After holding evidentiary hearings on December 9, 2020 and December 11, 2020, the Court took this matter under advisement. The Court finds Debtor's Amended Objection to Claim should be granted in part, and denied in part.

## BACKGROUND

Rickey Conradt, Inc. ("Debtor" or "RCI") filed its Chapter 11 petition on March 18, 2020.[2] Debtor filed its Schedules and Statement of Financial Affairs on April 1, 2020. (ECF No. 15). Debtor filed its Disclosure Statement and Small Business Plan of Reorganization on September 11, 2020. (ECF Nos. 69 and 70).[3] EG filed its original proof of claim on July 13, 2020, in the unsecured amount of $1,209,256.25. The attachment to the proof of claim recites the following basis for the claim:

> At all relevant times herein, Rickey Conradt, Inc. ("Debtor") operated as a public adjuster. Thus, Debtor's clients are insurance policyholders who have suffered casualty damage to their respective properties. The insureds retain public adjusters such as the Debtor to negotiate with the insurance companies providing coverage for the policyholders. Estimating Group's business is to provide estimates for the costs of labor and materials necessary to perform property remediation services.

> Accordingly, Debtor and Estimating Group entered into a series of oral contracts pursuant to which Estimating Group provided estimates for Debtor's clients in Puerto Rico, Texas, and Florida between 2014 and 2018, inclusive. For its services, the Debtor charged its clients 10% of the total amounts recovered from the clients' respective insurers. In turn, Debtor agreed to pay Estimating Group 10% of what *Debtor* received. Thus, Estimating Group's agreed upon compensation was 1% (equal to 10% of 10%) of the amount of insurance recoveries by the Debtor.

---

[2] Debtor filed an amended petition on April 22, 2020. (ECF No. 36).
[3] A hearing on the approval of Debtor's Disclosure Statement is continued until January 13, 2021. The hearing on Estimating Group's Motion to Convert Case from Chapter 11 to Chapter 7 (ECF No. 53) is reset to January 13, 2021.

> Attached hereto as Exhibit 2 is a true and accurate itemization of the estimates provided by Estimating Group to RCI, all of which remain unpaid. The principal sum allowed as established in Exhibit 2 is $1,074,959.25. After Debtor failed to pay, Estimating Group initiated a lawsuit against Debtor on December 17, 2018. Estimating Group has included in its Claim prejudgment interest at the Indiana statutory rate of 8% per annum from December 17, 2018 through July 10, 2020. As such, the total amount of prejudgment interest included in Estimating Group's claim is $134,296.36 for a total claim through July 10, 2020 of $1,209,256.25.

Proof of Claim 5-1, Attachment 1, p. 1 of 2.

Debtor filed its Amended Objection to EG's proof of claim on October 29, 2020. (ECF No. 93). The Amended Objection restates the grounds for the original objection to claim but also adds affirmative defenses in response to the proof of claim. In summary form, Debtor objects to EG's claims as follows:

> (1) The Proof of Claim does not constitute a *prima facie* claim because it does not comply with the requirements set forth in Rule 3001 nor does it meet the substantive requirements set forth in Rule 3001 nor does it meet the substantive requirements set forth in 11 U.S.C. § 502(b).

> (2) The Proof of Claim does not support a valid claim under 11 U.S.C. § 502(b) and should be disallowed, or if found to be valid in part, reduced by any invalid amount. The claim is the subject of litigation pending in the United States District Court, Southern District of Indiana, Indianapolis Division, Case No. 1:19-cv-00586-RLY-DLP and therefore the Creditor is not entitled to a Proof of Claim in said amount or any corresponding interest, costs or attorney's fees related to that cause of action.

> (3) The Proof of Claim and its supporting documents, if any, do not support the validity and/or the amount of the claim, and Debtor hereby disputes that to the extent not so supported. Therefore, pursuant to 11 U.S.C. § 502(b), the claim should be reduced or disallowed in its entirety.

> (4) Debtor asserts the affirmative defenses that the Proof of Claim is barred by claims own material breaches of contract; it is barred by the doctrine of illegality; is barred by the doctrine of latches; is barred by the doctrine of unclean hands; is barred by the doctrine of waiver; is barred or reduced by Claimant's failure to mitigate her damages; and Claimant's damages, if any, were caused by persons other than the Debtor.

(ECF No. 93, pp. 2–3).

## FINDINGS OF FACT

The hearing was conducted on the WebEx platform. All witnesses appeared through

WebEx except for Jordan Lutton who appeared telephonically. The following witnesses testified and are identified by their role in this dispute:

Eric Shupper – public adjuster who prepared estimates for RCI and is a creditor of Debtor. Shupper filed a lawsuit[4] against Debtor that settled for $80,000.00 pursuant to a Rule 9019 Application to Compromise. (ECF No. 109).

Rickey Conradt – Debtor's representative and 100 percent owner. Conradt provided testimony to support what he thought the oral contract was with EG concerning payment for services rendered; calculations regarding the correct amount of EG's proof of claim; and testimony regarding industry practices involving payments of estimates for insurance claims.

Mickey L. Jones – public adjuster who provided estimates to Debtor.

Thomas Tate – owner of a construction company that used EG to prepare estimates for projects in Abilene, Texas.[5]

Jordan Lutton – individual who worked for RCI and gathered information for RCI in connection with hurricane damage in Puerto Rico. Lutton's work included preparing "scope notes," taking measurements on damaged buildings, and taking photos.

Mary Lopez – Estimating Group's representative and 100 percent owner. Lopez provided testimony in support of what she thought the oral contract was with Debtor concerning payment for services rendered; calculations regarding the correct amount of EG's proof of claim; and testimony regarding industry practices involving payments of estimates for insurance claims.

Based upon the parties' presentations of fact and evidence, there are three necessary considerations for the Court to adjudicate Debtor's Amended Claim Objection. First, the Court must consider if there is evidence to support an oral contract between RCI and EG, and, if so, what

---

[4] Shupper filed a state court action against Debtor for unpaid moneys that was removed to this Court. Adversary No. 20-05022-cag.

[5] RCI alleges that it is not responsible for reimbursing EG for any services relating to the Abilene projects.

the terms of payment were between RCI and EG. Second, the Court must evaluate whether Debtor presented evidence to rebut the validity of EG's proof of claim and establish the correct amount Debtor owed EG. Third—assuming RCI rebutted the prima facie validity of EG's proof of claim—the Court must decide if EG provided competent evidence to support its claim amount. In addition, the Court must determine if EG is entitled to pre-judgment interest of eight percent from December 17, 2018, through July 10, 2020 plus attorney's fees. EG offers no legal basis to support its entitlement to interest on its unsecured claim post-petition. Further, EG offers no evidence in support of its attorney's fees nor a legal basis for having its attorney's fees paid on an unsecured claim.

*Was there an oral contract between the parties and what were the terms?*

As an initial matter, the Court finds that there was a dearth of documentary evidence to support the terms of RCI and EG's oral contract. Both Conradt and Lopez acknowledged an oral contract existed wherein EG would provide RCI estimates for insurance claims. Although the testimony varied, both Conradt and Lopez indicated their oral contract was the same for all estimates EG provided RCI. Lopez stated that RCI—through Conradt—would contact her either by telephone, e-mail, and possibly text message about a project and she would do the estimating work and provide the estimate to RCI. Lopez stated that this arrangement started in approximately 2014 and continued until August 2018. Thereafter, the oral contract terminated because of RCI's nonpayment and Conradt's contention that EG was only entitled to one percent of what RCI was paid.

Further, Conradt testified that he thought RCI's oral contract with EG provided that EG would not be paid if an insurance claim went to appraisal or litigation.[6] Conradt, Lopez, and

---

[6] In response to Creditor's First Set of Interrogatories, RCI was asked what the terms of its oral contract with EG were. RCI answered that RCI was to pay EG one percent of what it was paid. RCI did not qualify that no payment would be made if the claim went to appraisal or litigation. (Creditor "Cr" 16).

Shupper all stated that the relationship between RCI and the insurance company was that RCI contracted with the insurance company to provide an estimate regarding the nature of the damage to the insured property and an estimate of the cost of repair. RCI would contract directly with EG to provide the estimate that RCI would use to provide the estimate to the insurance carrier. There was no privity of contract between EG, the insurance carrier, or the insured. Conradt and Lopez acknowledged it was common in the insurance industry for claims to go to "appraisal," meaning that a third party might choose between what the insured and insurance carrier believed was the proper amount of the claim. If the matter could not be resolved through the appraisal process, then the dispute would proceed to litigation.

Conradt testified initially that in situations where an insurance claim went to appraisal or litigation, RCI was not paid. Later in his testimony, however, Conradt contradicted himself by acknowledging that RCI could be compensated for its estimates once a matter was resolved through appraisal or litigation. Appraisal or litigation could take years to resolve. Conradt contended that where a claim went to appraisal or litigation, EG was not entitled to payment for any estimating work it performed because those matters were resolved without using EG's estimate. Conradt further contended that in situations where RCI was not paid, EG should not receive payment—even if EG provided estimation services before the claim went to appraisal or litigation.

Lopez stated that it is customary industry practice for insurance claims to go to appraisal or litigation. Lopez maintained that if adjustors or estimators were not paid in those situations, no one could sustain a business model of not being paid. Lopez stated that if RCI is paid either through the appraisal or litigation process, then EG should be paid as well based on EG's oral contract with RCI. Shupper, who is also a public adjuster, and worked with both RCI and EG, testified that the industry practice was that a public adjuster who prepares a claim estimate that goes to appraisal or

litigation gets paid. Shupper also stated that based upon his working relationship with both RCI and EG, he understood that RCI paid EG ten percent of what RCI was paid.[7] Further, Shupper testified that the industry standard for this type of arrangement was the public adjuster to pay ten percent of what the adjuster receives to the entity preparing the estimate.[8]

Lopez has 15 years of experience as a large loss estimator for storm-destroyed properties. She is the only employee of EG. EG provides estimates for property located in the southern United States, primarily in Florida, Texas, and Louisiana. Lopez has a level 3 certification as an estimator and uses "Xactomate" to determine the amount of property damage and repairs necessary. Lopez explained that the estimates she prepares require working with general contractors and public adjustors; knowledge of building codes; and an understanding of construction/repair of large buildings. Lopez maintained that she receives high praise for her work and competency with no negative reviews. Lopez stated that the parties' understanding was that RCI would pay EG ten percent of what RCI was paid. Notably, from the time period of 2014–2018, RCI paid a minimal amount of what it owed EG (roughly $20,000) so there is little evidence of the customary amount remitted to EG.

Lopez stated that EG receives payment from other public adjustors for her estimates after a claim is resolved through the appraisal process or litigation. Further, Lopez stated that EG customarily receives one percent of the total allowed claim or ten percent of what the adjustor is paid. Lopez disputed RCI's contention that RCI previously agreed to pay her only one percent of what RCI was paid. Moreover, Lopez contended that the issue regarding the percentage amount RCI owed EG only arose after August 2018 when EG notified RCI that it would no longer prepare

---

[7] *See* Cr-6 wherein Shupper (on behalf of RCI) emails Lopez to prepare an estimate for Regency Oaks Apartments in Orlando, Florida with "scope notes" and pictures of the damage.

[8] Cr-10 is an email between Shupper, Lopez, and Conradt regarding RCI's obligation to pay Shupper and Lopez for work performed on the "Groves project" wherein Shupper asserts that RCI owed EG ten percent of what RCI was paid for preparing the claim estimate.

estimates until EG was paid for services rendered.

EG provided emails supporting EG's contention that EG is paid ten percent of what the public adjustor is paid. In May 2018, EG sent RCI an invoice for $12,650.00 for work performed on the Valencia Fire project. (Cr-8). The attachment to Cr-8 shows EG invoiced RCI for three payments from December 2017 through March 2018 in the total amount of $12,650.00. Cr-9 is an email from Shupper to Lopez stating that RCI was paid in total $126,500.00 for RCI's work on the Valencia Fire project. EG charged $12,650.00 for its work on the Valencia Fire project, which is ten percent of what RCI was paid. Shupper sent an email to Lopez in July 2018 indicating that EG was to be paid $5,740.00 for estimates EG prepared. (Cr-10). Shupper indicates that RCI was paid $57,404.00 for the Groves project. Lopez maintains that the first time RCI told her that she was to be paid one percent for her work, and not ten percent, was when she invoiced RCI for $5,740.00 for estimates on the Grove Apartments. (Cr-11). Lopez submitted this invoice to RCI in August 2018, and it was not paid. As such, EG elected to no longer provide estimates for RCI. RCI responded to EG's demand for payment by stating that the oral contract between RCI and EG required RCI to only pay EG one percent of what RCI was paid.

Lopez testified that after RCI disputed the terms of their oral contract, she made multiple efforts to contact Conradt to work out their differences regarding payment. Lopez explained that because Conradt was non-responsive, she believed she had no choice but to terminate her business relationship with RCI. On cross-examination, Lopez admitted that there was no written document regarding her contract with RCI nor any emails confirming their contractual arrangement. Lopez was steadfast in her testimony that she believed that she was to be paid ten percent of what RCI was paid. Lopez further explained that she has no way to know or verify what RCI is paid or when RCI is paid because she has no contractual relationship with the insured or the insurer.

8

*Did RCI present enough evidence to rebut the prima facie validity of EG's proof of claim?*

Conradt testified in support of RCI's contention that EG's proof of claim was not prima facie correct. RCI offered two exhibits to demonstrate that EG either did not perform certain estimates or that EG has incorrectly calculated its proof of claim. (Debtor "D" 1 and 2). In addition, Debtor produced witnesses to show that EG did not prepare certain estimates, and that another party prepared the estimates RCI used.

Conradt explained that D-1 is a spreadsheet he prepared showing all the projects or claims that RCI worked on, and who provided estimates for RCI. Conradt acknowledged that EG has a valid claim for payment for items 1, 2 and 4–16 as indicated on the spreadsheet—but at one percent of what RCI was paid, not ten percent. Conradt indicated that there was a business interruption claim for item #3 for loss of use, which is a different kind of claim. As to item 17 (West Gaines Seed), Conradt asserts that the claim went to litigation, and, as such, EG will not get paid. Nonetheless, Conradt indicated that RCI was paid $125,000.00 on the West Gaines Seed project.

Conradt testified on items 19–21 (Catholic Diocese of Amarillo) that Mickey Jones was the estimator for RCI. Conradt stated that Rick Riley or his brother Dave Riley did the appraisal and that RCI was paid $59,526.50. Conradt testified that EG performed no work on this project. Mickey Jones, a public adjuster in roughly 31 states, also testified that he did the estimates for the Diocese of Amarillo that included several parishes. Jones stated that he did not know if any other estimator provided estimates and that he was unfamiliar with EG. Further, Jones stated that he uses a program called "Symbility" for estimating claims, not Xactimate.

Conradt stated that on item 22 (Happy State Bank) EG did estimating work for RCI, but the claim went to appraisal and that Rick Riley was paid for the appraisal from funds that RCI received. Conradt indicated in D-1 that RCI was paid $134,656.59 for work on the Happy State Bank. Conradt contended that EG's estimate was not used in the appraisal process, so EG should

not receive any payment.

Conradt stated that item 27 (Tora Prep) that EG did some of the estimating work, but because Jason Malone did the appraisal for the project, that EG should not receive any payment. RCI was paid $17,497.50. Conradt also stated that EG did the work on the Cross Timbers Apartments (item 30) and RCI was paid $300,000. Conradt contended that EG should only receive one, not ten percent, of what RCI was paid. Conradt stated that because RCI made no claim for payment on items 31–39, EG should not be paid for its work.

Conradt testified as to items 41–49 (the Boykin properties) that RCI used Tom Tate and Tate's construction company, Titan Services Inc. to prepare the estimates for these properties.[9] The Boykin properties are in Abilene, Texas and consist of roughly 26 to 28 buildings of similar dimensions and construction. The evidence is mixed on who did the initial estimates. Tate testified that he used EG to prepare some follow up estimates on the buildings and paid EG $1,500.00.[10] Tate could not recall if EG did the initial estimates for the Boykin properties. Mickey Jones stated that he did the initial estimates for the Boykin properties and was paid. Jones does not recall what he was paid nor if any other estimator (including EG) prepared any estimates on these properties.[11] Conradt insisted that he did not use any of EG's estimates, either in their original form or subsequent amendments, that were submitted to Tate.

Conradt stated that items 50–85 were hurricane damaged properties in Puerto Rico. Conradt testified that EG did the initial estimates on all the properties, but because EG's computer files were in such disarray, RCI could not use them. Conradt stated that he had to hire two

---

[9] D-2 (Bates numbers 26, 34–46) includes checks payable to RCI that reference the Boykin properties. The checks appear to comport with payments listed on D-1. D-4 includes Titan Services, Inc.'s invoice to EG and payment for EG's estimates in the amount of $1,500.00.

[10] *See* D-4 which includes an email from Tate to Wilkins that includes the work EG did on the Boykin Properties and payment of $1,500.00 to EG.

[11] Debtor did provide some of Jones' estimates for the Boykin properties with some invoices. (D-3).

estimators to redo the estimates. Jordan Lutton was one of the estimators. Lutton is not a public adjustor by practice, but he went to Puerto Rico to sign up clients, measure the properties, place the information on a Google Drive account, and write the estimates. Lutton attempted to use the estimates that EG previously prepared, but the files were in disarray with discrepancies in the estimates. Lutton contacted Lopez about the condition of the estimates. According to Lutton, Lopez removed her estimates from the Google Drive she created for the Puerto Rico properties. When Lutton and another adjustor attempted to recreate the EG estimates, they were either compromised or removed. As such, Lutton testified that he had to redo all the estimates. Lutton worked with EG on the Puerto Rico estimates but did not know if EG was paid for its work. Lutton also did not know if RCI kept a copy of EG's estimates.

Conradt testified that he did not hire EG or use its estimates (if estimates were done) for the properties indicated on D-1, items 86–93.[12] On item 94, Rancho Verde Apartments in Houston, Conradt says that RCI was paid $75,000, and that RCI owes EG one percent of that amount.[13] As to remaining items 95–104, Conradt maintains that he did not hire EG to do any of the estimates and that he used other public adjustors.

Conradt testified regarding D-2. Exhibit D-2 contains copies of checks RCI received for work performed with what appears to be ledger entries for deposits of the checks. Conradt explained that he took "all the checks he could find" and applied them to projects that Conradt believed EG represented in its proof of claim as being projects for which RCI owed EG money for estimating services provided. Based upon these checks, Conradt prepared Exhibit D-1 and incorporated his understanding of whether EG prepared the estimates, and if RCI had paid EG for estimates. The Court has carefully studied the checks and accompanying deposit information. The

---

[12] D-5 is Jason Malone's invoice for his appraisal work performed for item 86, the Congregation B'nai Amoona. The exhibit does not indicate any EG services being provided or used.

[13] Exhibit D-1 states that EG should be paid $7,500.00, which is ten percent of what RCI was paid.

Court cannot discern much correlation between the checks that are associated as payment for a project. Further, there is no other source information for Conradt's belief as to which projects RCI did not use EG estimates. That said, Tate, Jones, and Shupper testified credibly and in corroboration on some of the details of Conradt's D-1 spreadsheet as to who prepared the estimates for RCI.

*Did EG provide enough evidence to rebut RCI's evidence and establish the validity and amount of its proof of claim?*

Mary Lopez testified in support of the validity and amount of EG's proof of claim. Lopez testified in support of EG's exhibits that purport to show the basis of EG's proof of claim. Cr-1 is an email from Conradt to Lopez dated November 29, 2017, in which Conradt states that EG did estimates for Rick (presumably Riley) 3–4 years ago on the Boykin properties and that RCI would like EG to update its estimates and include new items in EG's estimates. Cr-2 and Cr-4 are estimates that EG provided to RCI for some of the Boykin properties. Cr-3 is the estimate that Lopez did for Tate and Titan Services, Inc. Lopez explained that EG provided the initial estimates for the Boykin properties and updated them for Tate on the Boykin properties. Lopez stated that it was common for her to do both the initial estimates for a project and then to update them if a public adjuster asked for updates. Lopez remarked that she must have provided the initial estimates for the Boykin properties because she could not "update" something she had not done.

Lopez disputed Conradt's testimony regarding her estimates for the Puerto Rico properties. Lopez stated that RCI retained EG to provide estimates for property damage in Puerto Rico. Lopez explained that she organized her work into multiple files that included scope notes, photos, and estimates. EG uses Google Drive to provide access to these materials. Lopez explained that she does not email her estimates or files because they are too large to send. Further, Lopez indicated that in creating her own Google Drive, she can control access to the files and more easily exchange

information. Lopez testified that when Conradt refused to pay EG on delinquent invoices and would not return her calls or e-mails, Lopez shut off access to the Google Drive for the Puerto Rico project and removed the files she created. Lopez maintained she provided Lutton and Austin Jehl (the other Puerto Rico estimator) access to her Puerto Rico files so they could complete their work in Puerto Rico. Lopez stated that Lutton or Jehl were unable to download the files in the same form as she put them on her Google Drive, thereby causing them to be "scrambled" and in disorder. Further, notwithstanding Conradt's statements that RCI did not use EG's estimates, Lutton did tell Lopez via text that RCI was using EG's estimates. (Cr-13). Cr-13 includes several text exchanges between Lutton and Lopez in which Lutton implores Lopez to share her estimates with him and Jehl so that they can finish their work in Puerto Rico.

Like Conradt, Lopez prepared her own worksheet of all the estimates she prepared for RCI. (Cr-15). Lopez stated that Cr-15 includes all the estimates she performed for RCI in her database and that there may be multiple estimates for the same property. Lopez compared her spreadsheet labeled Cr-15 with D-1. Lopez argued that Debtor's worksheet does not include EG's work for estimates that were not included in D-1 in the approximate amount of $35,000.00. Also, EG contends that claims that went to appraisal or litigation should still result in EG being compensated. EG estimates that amount is $36,000.00. Lopez argues that RCI failed to pay her ten percent of what RCI received for its Valencia Fire work, which was ten percent of $126,500.00 or $12,650.00 in total. Lopez stated that she prepared the estimates for the Boykin properties, and that the total amount of her work is approximately $70,500.00. In total, Lopez contends that RCI has not given EG credit for approximately $154,000.00 worth of work. When this amount is added to what Debtor already stated it owes EG (assuming a ten percent amount, not one percent application) Lopez believes that the total amount owed is around $330,000.00. Lopez also stated that RCI has included in its D-1 estimates for projects in which no payment has been made due to pending

appraisals or litigation. Lopez estimates that amount to be roughly $350,000.00. Lopez argues that her proof of claim should be allowed in the approximate amount of $686,000.00. Nonetheless, Lopez agrees that if RCI is not paid on claims subject to litigation, EG cannot be paid either. Lopez noted that she does not possess the source documents concerning any RCI claims, only Debtor does. Lopez explained that EG attempted to get RCI's source documents in the Indiana litigation, but that RCI would not produce them to her.

## ANALYSIS

*Burden of Proof*

Under Rule 3001(f) of the Federal Rules of Bankruptcy Procedure, a party correctly filing a proof of claim is deemed to have established a prima facie case. ***In re Palms At Water's Edge, L.P.***, 334 B.R. 853, 857 (Bankr. W.D. Tex. 2005) (citing ***In re Fidelity Holding Co., Ltd.****,* 837 F.2d 696, 698 (5th Cir. 1988)). The claimant will prevail unless the objecting party produces evidence sufficient to rebut the prima facie validity of the claim. ***Id***. Once the claim is rebutted, then whichever party would have the burden of proof in respect to the claim outside the bankruptcy bears that same burden in bankruptcy. ***Id***. (citing ***Raleigh v. Ill. Dep't of Revenue****,* 530 U.S. 15, 19 (2000); ***In re Promedco of Los Cruces****,* 275 B.R. 499, 503 (Bankr. N.D. Tex. 2002)). In contesting a claim for an oral contract, the burden of proof falls on the party claiming the existence of an oral contract and its breach. ***Id***.

Assuming EG has correctly filed its proof of claim sufficient to establish a prima facie case, then RCI bears the burden to produce evidence sufficient to rebut the prima facie validity of EG's claim. If the Court determines EG's claim is rebutted, the burden of proof shifts to EG to produce evidence to support: (1) its contentions that under the terms of the oral contract, EG was to receive ten percent of funds paid to Debtor, and (2) the amount of unpaid services performed consistent with the parties' agreement.

*Existence and Terms of an Oral Contract.*

Notably, the parties do not dispute the existence of an oral contract between Debtor and EG for estimating services. Rather, the parties dispute the contract's price and payment terms. Specifically, the parties disagree as to the contract's price terms; whether EG can be paid when the claim goes to appraisal or litigation; and whether RCI is obligated to pay EG prior to receiving payment from the insurance company. Disputes of material terms—including an express price term—are not fatal to the existence of an oral contract. *Id*. at 858. When parties dispute price terms, Courts may supply a reasonable price term. *Id*. Moreover, Courts may infer the terms of an oral contract based on the parties' conduct and course of dealing. *Id.* at 857.

*Debtor's Defense of Illegality.*

In defense, Debtor asserts that because the oral contract between Debtor and EG is illegal, it is void and unenforceable. Tex. R. Civ. P. 94; ***Denson v. Dallas Cty. Credit Un.***, 262 S.W.3d 846, 852 (Tex. App.—Dallas 2008, no pet.); ***Academy of Skills & Knowledge, Inc. v. Charter Sch., USA, Inc.***, 260 S.W.3d 529, 545 (Tex. App.—Tyler 2008, pet. denied); ***Gupta v. E. Idaho Tumor Inst.***, 140 S.W.3d 747, 751–52 (Tex. App.—Houston [14th Dist.] 2004, pet. denied); ***TCA Bldg. Co. v. N.W. Res.***, 922 S.W.2d 629, 634–35 (Tex. App.—Waco 1996, writ denied). In Texas, a contract is illegal if the parties undertake to do an act forbidden by law in the place where the act is to occur. ***Ralston Purina Co. v. McKendrick***, 850 S.W.2d 629, 638–39 (Tex. App.—San Antonio 1993, writ denied).

Debtor raises the "doctrine of illegality" as an affirmative defense. Debtor asserts that pursuant to Tex. Ins. Code § 4102.160 EG cannot receive payments in Texas because EG is not a public adjustor. Debtor misconstrues the statute. Section 4102.160 of the Texas Insurance Code addresses payments for referrals—not estimating services. Specifically, Tex. Ins. Code § 4102.160(2) provides that license holders (such as Debtor) may not pay persons who are not licensed public insurance adjustors (such as EG) for "the *referral* of an insured to the public

insurance adjuster." Tex. Ins. Code § 4102.160(2) (West 2019) (emphasis added). The oral contract between Debtor and EG addressed payment for estimating services—not referrals. Accordingly, the right to payment under the oral contract is not illegal under Tex. Ins. Code § 4102.160. Debtor's defense of illegality is overruled.

## CONCLUSIONS OF LAW

The Court finds EG's proof of claim meets the proof of claim filing requirements because the proof of claim uses Official Form 410, is signed under penalty of perjury, and contains an itemization of the amounts EG asserts it is owed. Section 502(b) lists the basis for disallowing certain types of proof of claims. Here, the only basis that the Court can discern that EG may not assert is for unmatured interest. 11 U.S.C.A. § 502(b)(2) (West 2020). As such, the Court must decide if there was an oral contract between RCI and EG.

Finding there is an oral contract, the Court must determine if RCI and EG met their respective burdens as to the objection and allowance of EG's proof of claim. There are two components of EG's proof of claim. The first component is straight-forward: EG seeks a liquidated amount for claims that the insurance carrier paid RCI, of which EG contends it is entitled to ten percent. The second component requires the Court to consider whether EG can assert a contingent claim for claims that RCI argues are either in appraisal or in litigation, such that RCI has not yet been paid (and may never be paid). Finally, the Court must determine if EG entitled to interest on its claim plus attorney's fees.

The Court finds based on the evidence that there is an oral contract between RCI and EG. Shupper, Conradt, and Lopez all testified that RCI and EG did not enter into any written contracts, and that Conradt and Lopez entered into a series of oral contracts in which RCI asked EG to prepare estimates for particular properties. Conradt's testimony did not deny the existence of an oral contract, but alleged that the terms of payment were different than what EG asserts. The Court

16

finds Lopez and Shupper's testimony on this issue more credible. Shupper and Lopez explained that the industry standard was to pay the estimator ten percent. Further, Lopez stated that a one percent payment would not be a sustainable business model for insurance estimating. For roughly four years, Conradt did not indicate to EG that the rate of reimbursement was one percent; rather, Conradt made that assertion for the first time in August 2018 when EG refused to provide RCI estimating services and sued him for nonpayment.

In addition, EG provided emails to support its contention that EG is paid ten percent of what RCI is paid as the public adjustor. An e-mail from Shupper to Lopez states that RCI was paid $126,5000 in total for its work on the Valencia Fire project. (Cr-9). In May 2018, EG sent RCI an invoice for $12,650.00 for work performed on the Valencia Fire project—ten percent of what RCI was paid. (Cr-8). In a July 2018 email, Shupper (on behalf of RCI) informed Lopez that EG was to be paid $5,740.00 for estimates prepared on the Groves project—a project where RCI was paid $57,404.00 for its adjuster work. Moreover, Lopez maintained that the first time RCI told her she was to be paid one percent for her work, and not ten percent, was when she invoiced RCI for $5,740.00 for estimates on the Grove Apartments. (Cr-11). The Court finds the totality of the evidence, and the course of dealing between EG and RCI, support a finding that the rate of payment from RCI to EG is ten percent of what RCI was paid.

Conradt's answers to discovery and direct examination indicate he believed EG should not be paid for any estimating work where the insurance claim went to appraisal or litigation because in those situations, either an appraiser or litigation counsel would hire their own estimator to prove the correct amount of an insurance claim. As such, an appraiser or lawyer would not rely on EG's estimates. Conradt also stated that RCI would not expect to be reimbursed for its own work on matters going to appraisal or litigation. Later in his testimony, however, Conradt contradicted himself by acknowledging RCI could be compensated for estimates once a matter was resolved

through appraisal or litigation. Conradt indicated that appraisal or litigation could take years to resolve. Conradt acknowledged it is common in the insurance industry for claims to go to "appraisal"—meaning that a third party might choose between the insured and insurance carrier's decision regarding the proper amount of the claim.

Lopez stated that the customary industry practice was for insurance claims to go to appraisal or litigation. Lopez maintained that if adjustors or estimators were not paid in those situations, no one could sustain an estimating business. Lopez stated that if RCI is paid either through the appraisal or litigation process, then EG should be paid as well based on her oral contract with RCI. Shupper testified that the industry practice was that a public adjuster who prepares a claim estimate that goes to appraisal or litigation is paid. The Court finds Lopez and Shupper's testimony more credible. Conradt contradicted himself and stated that RCI was paid on some projects that went to appraisal or litigation. Further, the Court finds it illogical for any estimator to provide estimating services and agree to not be reimbursed because a dispute arose as to the amount of an insurance claim.

Finally, the Court must determine which party met its evidentiary burden in establishing the correct amount of EG's proof of claim. At the hearing, Conradt admitted exhibit D-1—a spreadsheet he compiled consisting of all of the claims for which EG seeks payment from RCI for its estimating work. Conradt testified that RCI was not paid for some of the claims listed in D-1. EG did not directly rebut Conradt's contention other than to summarize what EG's records indicate RCI owes EG. Conradt maintains that Mickey Jones prepared the estimates for the "Boykin properties" in Amarillo. Jones (Conradt's former brother-in-law) also testified that he prepared estimates on the Boykin properties, but stated that he had no personal knowledge if anyone else (including EG) also prepared estimates. (D-3). Thomas Tate—who the Court finds credible and forthright—testified that he asked Lopez to *update* her estimates on the Boykin properties. Tate

paid EG $1,500.00 for its estimates on the Boykin properties. (D-4). Lopez testified that she also performed estimates on the Boykin properties and billed RCI for the estimates. (D-2) and (D-3). Further, in an email dated November 29, 2017, Conradt asked Lopez if she prepared estimates for the Boykin properties and asked for the list of properties that EG had provided estimates and that the estimates be updated.

In sum, the oral testimony suggests that Jones, Lopez, and Tate prepared estimates on the Boykin properties. The record is unclear as to who prepared the estimates first. The checks contained in D-2 establish that RCI was paid for adjustor work on the Boykin properties. Mickey Jones provided some invoices that represent he prepared an estimate on the Boykin properties on December 1, 2015. (D-3, bates no. 5). Tate indicated in an email to Debtor's counsel that he prepared estimates on the Boykin properties in November 2017 and that he asked EG to update its earlier estimates on the Boykin properties. (D-4). D-1 states that either Jones or Tate did the estimates for the Boykin properties. In comparison, EG produced an email wherein Conradt asked EG to update its estimates on the Boykin properties that, according to Conradt, were done 3 to 4 years ago.[14]

The Court has carefully examined (Cr-2) – (Cr-5) that EG represents are the estimates that EG prepared for the Boykin properties. The estimates are undated but for a few Google earth pictures dated from January 2018, which support Tate's statements that EG updated its estimates for Titan Services. Further, there is one picture in Cr-3 that shows that Rick Riley took pictures of the same properties in August 2011. (Cr-3, p. 23). The Court does not doubt that EG provided estimates to Tate and RCI in 2017–18, but the preponderance of the evidence supports that Jones and Riley provided estimates to RCI originally. Jones corroborates RCI's assertion that Jones did

_____
[14] November 17, 2017, email from Conradt to Lopez.

the estimates that RCI used for its adjustor work on the Boykin properties. Other than Lopez's testimony, EG has no additional evidence to support its assertion that EG should be compensated for its estimates. Based on the totality of evidence presented, the Court finds that EG did not rebut RCI's assertion that it did not use EG's estimates for the Boykin properties. As such, that component of EG's claim is disallowed.

RCI argues that it did not use EG's estimates for the Puerto Rico properties because of the condition of the estimates and EG's refusal to grant access to the Google Drive for EG's estimates. The Court finds compelling both Lopez's and Lutton's (a disinterested party) testimony on this issue. Conradt's testimony that he did not use EG's estimates for the Puerto Rico properties is contradicted by Lutton's texts to Lopez begging her to assist Lutton and Juehl with their work so that they could complete their estimates for RCI. (Cr-13). Lutton's testimony corroborates EG's assertion that it did the work for the Puerto Rico properties but pulled its estimates once RCI refused payment. Conradt's testimony on this issue was that RCI did not use EG's estimates, but the evidence demonstrates that the only reason RCI did not use EG's estimates was because EG first blocked access to its Google Drive and that Lutton and Juehl were unable to covert EG's files for their use. The Court finds that EG's estimates and work on the Puerto Rico properties is allowed.

The Court believes that the best methodology to use in determining the allowed amount of EG's proof of claim is to use EG's calculations in Cr-15 where either RCI agrees that it owes EG for its estimates, or where EG has rebutted RCI's contention that EG should not receive payment because the matter went to appraisal or litigation. Conversely, for estimates on D-1 in which Debtor claims it made no claim with the insurer, EG's claim for those estimates is disallowed. In summary form, using D-1 as a guide, the Court calculates EG's claim as follows:

20

| | |
|---|---|
| Items #1-16, but not #3 | $132,738.59 |
| West Gaines (#18) | $33,348.41 |
| Happy State Bank (#22) | $14,000.00 |
| Torah Prep School of St. Louis (#27) | $7,200.00 |
| Cross Timbers (#30) | $5,000.00 |
| Puerto Rico (#50-#85) | $250,213.34 |
| Congregation B'nai Amoona (#86) | $15,540.52 |
| Rancho Verde Apts. (#94) | $17,166.32 |
| Total: | **$475,207.18** |

The Court reaches its conclusion based upon the credibility of the witnesses, the corroborating written evidence (or lack thereof), and the Court's attempt to adjudicate a dispute in which the parties neglected to memorialize their contract and present source documentation that would have allowed the Court to evaluate the merits of each party's contentions.[15] EG provided no evidence regarding attorney's fees or the basis for the allowance of its attorney's fee. Therefore, any request for attorney's fees is denied. The Court also denies EG's request for pre- and post-judgment interest because EG failed to provide any basis for the calculation of that interest or the legal basis for EG to receive interest on its unsecured claim.[16]

Finally, both parties acknowledged that EG might have a contingent claim based upon EG's estimates for claims still pending due to an appraisal or litigation yet unresolved at the time of the claim objection. Both parties agree that RCI could be paid for these claims at a later unknown date. The parties did not provide the Court enough evidence or guidance on how the Court could

---

[15] EG's counsel stated that EG requested discovery in the related federal case in Indiana regarding how the insured determined what to pay RCI but that RCI resisted that discovery. The Court did allow limited discovery regarding Debtor's objection to EG's proof of claim to which Debtor timely responded.

[16] This does not preclude EG asserting a basis for payment of post-confirmation interest on its allowed claim pursuant to Debtor's Chapter 11 Plan.

estimate these possible contingent claims. As such, the Court grants leave to either Debtor or EG to seek a determination under 11 U.S.C. § 502(c) for an estimation of any unknown or contingent claims prior to Debtor's chapter 11 plan confirmation hearing.

IT IS THEREFORE ORDERED that Debtor's Amended Objection to Claim is GRANTED IN PART AND DENIED IN PART. EG has an allowed unsecured nonpriority claim of $475,207.18.

IT IS FURTHER ORDERED that this Order is without prejudice to either party seeking a determination regarding EG's unknown or contingent claims.

IT IS FURTHER ORDERED that Debtor's affirmative defenses, in addition to illegality, are DENIED.

IT IS FURTHER ORDERED that each party shall bear its own costs in this matter.

# # #